UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ELOUISE BROWN                                    CIVIL ACTION

VERSUS                                           NUMBER: 05-1323

JO ANNE B. BARNHART,                             SECTION: "R"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

**REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this
matter comes before the Court on the parties' cross-motions for
summary judgment following a decision of the Commissioner of the
Social Security Administration denying plaintiff's applications for
Disability Insurance Benefits ("DIB") and for Supplemental Security
Income ("SSI") benefits based on disability.  (Rec. docs. 14, 19).

Elouise Brown, plaintiff herein, filed an application for
DIB[1]/ on January 31, 2003, alleging disability as of October 1,

_____

[1]/ The record does not contain an application for SSI benefits
from plaintiff.  Nevertheless, since the parties and the
Administrative Law Judge ("ALJ") below have all proceeded on the

1999. (Tr. pp. 69-71). In a Disability Report completed by plaintiff on the former date, she identified high blood pressure, diabetes, back and heart conditions, spurs on the body, and a heart murmur as the conditions limiting her ability to work. (Tr. pp. 91-97). Those conditions first began bothering plaintiff on October 1, 1999 and rendered her unable to work as of that date. (Id.).

Plaintiff's request for Social Security benefits was denied by the Administration on April 21, 2003. (Tr. pp. 40-44). Pursuant to her request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on November 18, 2003 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 45-46, 273-293).[2]/ On December 16, 2003, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 30-39). On review to the Appeals Council ("AC"), that tribunal remanded the matter back to the ALJ for further evaluation and development of the record. (Tr. pp. 51-54).

Following the remand, the ALJ held a second administrative

_____

assumption that plaintiff had indeed filed an application for SSI benefits, the Court will do likewise.

[2]/ At the administrative hearing, plaintiff withdrew her application for DIB and amended the onset date in her putative application for SSI benefits to January 31, 2003, the date her application for DIB was actually filed. (Tr. p. 33).

2

hearing on November 16, 2004 at which plaintiff, who was again represented by counsel, and a second VE appeared and testified. (Tr. pp. 294-335). On December 20, 2004, the ALJ issued a second written decision in which he once again concluded that plaintiff was not disabled. (Tr. pp. 10-24). The AC subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 6-8). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§1383(c)(3) and 405(g).

In her cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

    I.   [t]he ALJ erred by failing to find plaintiff
         disabled under Grid Rule 201.06.

    II.  [t]he ALJ erred by failing to find plaintiff
         disabled due to the combination of her multiple
         impairments.

                                            (Rec. doc. 14, p. 11).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

    1.   [c]laimant last met the disability insured status
         requirements of Title II of the Act on June 30,
         2000, and does not satisfy the specially insured
         status requirements for entitlement to disability
         insurance benefits under Title II of the Act.

    2.   [t]here is currently no evidence indicating that
         [claimant] engaged in substantial gainful activity
         subsequent to the alleged onset date.

    3.   [c]laimant has impairments (degenerative joint

3

disease in the hands, knees and right hip; degenerative disc disease of the lumbar spine; diabetes mellitus; history of hypertension; Class IIB heart disease; carpal tunnel syndrome), which more than minimally limit her ability to engage in regular work-related activities and can be considered as "severe" within the meaning of 20 C.F.R. 404.1520(C), 416.920(C), Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985) and SSR 96-3p.

4.   [t]he medical evidence fails to demonstrate that claimant's impairments, whether considered singly or in combination, meet or equal the severity criteria of any impairment described at 20 C.F.R. Pt. 404, Subpt. P, App. 1.

5.   [c]laimant's testimony did not establish the existence of disabling limitations and was out of proportion with the objective degree of impairment shown in the medical evidence.

6.   [c]laimant is currently 57 years of age.  She was 52-years-old as of the alleged onset date.  She has a high school diploma, three years of college education and training as an insurance agent.  She has past relevant work experience as a cashier, insurance agent, and mail handler.

7.   [c]laimant retains the residual functional capacity to lift twenty pounds at a time with frequent lifting and carrying of objects weighing up to ten pounds, walking and standing for up to 4 hours in an 8-hour day and sitting for up to 6 hours in an 8-hour day with the option to alternate between sitting and standing. Stooping can be performed on an occasional basis and claimant's ability to maintain attention and concentration for extended period is not more than slightly limited.  The diagnosis of right carpal tunnel syndrome is not synonymous with functional limitation of the upper extremities and claimant ca[n] can grasp, turn, hold and use her fingers within the exertional range specified.

8.   [c]laimant has transferable cashier skills that include operating a cash register, tabulating a cash register drawer and clerical and record keeping skills associated with her past relevant

4

work as an insurance agent.

9.   [b]ased on the above residual functional capacity
     and the credible testimony from the vocational
     expert, I find that claimant is able to perform her
     past relevant work as a cashier as it is
     customarily performed at sedentary and light levels
     in the national economy without significant
     vocational adjustment due to technological changes
     or competitive compromise based on age.

10.  [c]laimant can also perform the following jobs
     existing in significant numbers in the national
     economy; cashier (sedentary and light); library
     clerk (light); general office clerk (sedentary and
     light).

11.  [c]laimant has not been under a "disability" as
     defined in the Social Security Act at any relevant
     time through the date of this decision.

                                        (Tr. pp. 22-23).

     Judicial review of the Commissioner's decision to deny Social

Security benefits is limited under 42 U.S.C. §405(g) to two

inquiries: (1) whether substantial evidence of record supports the

Commissioner's decision, and (2) whether the decision comports with

relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292

(5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir.

1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the

Commissioner's findings are supported by substantial evidence, they

are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson

v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no

substantial evidence is appropriate only if no credible evidentiary

choices or medical findings exist to support the Commissioner's

decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues <u>de novo</u>, nor may it substitute its judgment for that of the Commissioner. <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking Social Security benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act. <u>Harrell v. Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. <u>Harrell</u>, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set

forth in 20 C.F.R. §416.920, as follows:

    1.  an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

    2.  an individual who does not have a "severe impairment" will not be found to be disabled.

    3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

    4.  if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

    5.  if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past.  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  In determining whether a claimant is capable of performing the work that she has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. <u>Villa</u>, 895 F.2d at 1022; <u>Hollis v. Bowen</u>, 837 F.2d 1378, 1386 (5th Cir. 1988); <u>Epps v. Harris</u>, 624 F.2d 1267, 1274 (5th Cir. 1980). If the analysis reaches the fifth step, the ALJ may establish that

there is other work available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)).  Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

Plaintiff was fifty-seven years of age at the time of the administrative hearing held on November 16, 2004.  She testified to suffering from carpal tunnel syndrome in the left wrist which made it difficult for her to manipulate or hold objects in that hand. Plaintiff also suffered from two spurs in her left arm which she testified remained swollen.  Other conditions affecting plaintiff's ability to work were glaucoma in the right eye, soon expected to be in the left; lower back pain, constant even when sitting; spurs on both heels; and, insulin dependent diabetes, poorly controlled. The medications plaintiff was taking for her various conditions made her feel like she was floating.

At the time of the hearing, plaintiff was living with her cousins.  She did no yard work but was able to cook, clean, and do the laundry.  Plaintiff had attended three years of college in the mid to late 1960's and was approximately sixty hours short of obtaining a degree.  In terms of past relevant work, plaintiff

testified to most recently working as an insurance agent in which she went door-to-door collecting payments and searching for new customers. She had also worked in the Post Office as a mail handler in 1985.  Prior to that, plaintiff worked as a cashier on an on-and-off basis.  When asked why she could not presently work, plaintiff testified that the standing demands of her past jobs as a cashier and mail handler could not be met due to her medical condition.  In addition, at the latter job she was required to lift seventy-five pound bags of mail which she could no longer do.  (Tr. pp. 296-306).

Upon being tendered to the ALJ for additional questioning, plaintiff admitted that she had worked as a cashier at Schwegmann's until 1989 and had held similar positions at Time Saver and Wal-Mart in 1988 and 1989.  Other past relevant work included that as a school bus driver, inventory control, and cleaning supervisor. At the previous administrative hearing, the VE had classified plaintiff's past jobs as a mail handler and cashier as light, semi-skilled work and her job as an insurance agent as light, skilled work.  (Tr. pp. 307-308).

Patricia Ehlinger, a VE, was next to take the stand.  She testified that as plaintiff had described it, her past work as a mail handler was heavy in nature but the job was typically performed as a medium exertion job. Plaintiff's past cashier job was considered to involve light, semi-skilled work and the

insurance agent position involved light, skilled work. As had been done at the previous administrative hearing, the ALJ posed a hypothetical question to the VE which assumed an individual who could lift twenty pounds frequently, ten pounds occasionally; walk and/or stand for four hours per eight-hour workday; sit six hours per eight hour workday with an option to alternate between sitting and standing; occasionally stoop; could grasp, turn, hold items, and use her fingers; and, who had a slightly reduced attention/concentration span over extended periods of time. Unlike the previous VE, Ms. Ehlinger testified that the described individual could perform plaintiff's past work as a cashier. To the hypothetical question as originally framed, the ALJ added that the described individual was fifty-seven years of age, had three years of college experience, and could read, write, and perform math skills. In answer to the hypothet as amended, Ms. Ehlinger testified, as had the previous VE, that the described individual could function as a light level library clerk, a sedentary level general office clerk, or a light or sedentary level cashier, with the pool of available light level jobs being reduced by 50% due to limitations on plaintiff's ability to walk/stand. The VE testified that plaintiff had acquired skills from her insurance agent and cashier work which would be transferable to other jobs with little or no difficulty. (Tr. pp. 308-314).

The VE was then tendered to plaintiff's counsel for further

questioning.  In answer to counsel's question, the VE testified that the individual described in the hypothetical questions could still function as a cashier if she could only stand for four hours per eight hour workday.  As described by plaintiff, however, the VE acknowledged that plaintiff would not be able to do her past cashier work.  Even though cashier technology had changed in recent years, the VE still believed that plaintiff could function in such a capacity with only minimal adjustments as many of the newer cash registers were actually easier to operate.  Nevertheless, the VE admitted that if plaintiff could use only one hand at work due to carpal tunnel syndrome, the cashier job could not be performed. Even wearing a wrist brace, the VE testified, would not prevent plaintiff from performing cashier work.  Toward the conclusion of the hearing, plaintiff's counsel argued that plaintiff's advanced age negated any advantage she may have had by possessing transferrable work skills.  In closing, the VE testified that if plaintiff experienced pain causing frequent interruptions in concentration due to diabetic neuropathy and carpal tunnel syndrome, there would be no work that she would be capable of performing.  (Tr. pp. 314-335).

The medical records generated during the relevant time period begin with radiologic reports from the Medical Center of Louisiana at New Orleans ("MCLNO") dated January 8, 2002.  X-rays of the right knee revealed degenerative changes and a patellar

enthesophyte and those of the lumbosacral spine revealed degenerative changes with osteophytes and some intervertebral disc space narrowing at L3-L4. (Tr. pp. 182-185). Plaintiff was seen at MCLNO the following day for monitoring of her various medical conditions which included anemia, high blood pressure, and obesity. Plaintiff was feeling "OK" at the time but complained of a dental problem and back and knee pain. Antibiotics and pain medication were prescribed and an appointment at the Dental Clinic was scheduled. (Tr. pp. 180-181). Plaintiff returned to MCLNO on January 28, 2002 and reported running out of her prescribed blood pressure medication one month earlier. Medications were prescribed, including Celebrex for plaintiff's back and knee, and plaintiff was referred to physical therapy and for additional testing. (Tr. pp. 177-179).

On February 28, 2002, plaintiff was seen again at MCLNO for follow-up of some gynecological problems. (Tr. p. 176). Plaintiff was diagnosed with new onset diabetes mellitus on April 15, 2002 and was prescribed medication for that condition as well as being instructed to observe a strict diabetic diet. (Tr. p. 175). Follow-up gynecological case was administered on May 10, 2002. (Tr. pp. 173-174). Four days later, plaintiff returned to MCLNO with complaints of blurred vision, a dry mouth, weakness, and polyuria of several weeks' duration. Glucotrol and insulin were prescribed and plaintiff was instructed to adhere to her diabetic

diet and to monitor her blood sugar daily.  (Tr. pp. 169-172).
Plaintiff returned to MCLNO the very next day for a refill on one
of her prescribed medications.  (Tr. p. 168).  Routine lab work was
performed on May 17, 2002.  (Tr. pp. 186-188).  Zocor was added to
plaintiff's medication regimen on May 21, 2002.  (Tr. p. 167).

Plaintiff was next seen at MCLNO on July 30, 2002 for
monitoring of her diabetes and other medical conditions.  Plaintiff
was referred to the Diabetes Clinic and referrals to the Podiatry
and Opthamologist Clinics were also contemplated.  Her hypertension
was said to be controlled.  (Tr. p. 166).  Plaintiff complained of
a flutter to her chest when she was next seen at MCLNO on October
29, 2002.  A stress echocardiagram and EKG were scheduled as were
various other diagnostic tests.  (Tr. p. 165).  Plaintiff was seen
for diabetes management and an in-grown toenail on January 14,
2003.  (Tr. p. 192).  She then attended a diabetes self-management
class at the MCLNO Nutrition Service on January 15, 2003.  Despite
being counseled on the importance of adhering to a 1600 calorie/day
diet, plaintiff announced her intention to go on an "Elimination
Diet" to cleanse her body.  (Tr. p. 193).  Her condition was
monitored by MCLNO personnel on February 28, 2003 and additional
testing was scheduled.  (Tr. p. 191).

On March 24, 2003, plaintiff was consultatively evaluated by
Dr. Gary Carroll, an internist.  Plaintiff advised Dr. Carroll that
she had "last [been] employed performing security duties for

special events in 1999." She reported a history of pain and stiffness involving multiple joints, especially the back and knees, for the previous four to five years. Plaintiff's medications at the time were Novalin "N" and "R" for her diabetes, Prinizide, Zocor, Glipizide, aspirin, and Ibuprofen. Her daily activities included light household chores, resting, reading, and watching television.

Upon physical examination, plaintiff complained of occasional headaches relieved by Ibuprofen, occasional insomnia, and frequent easy fatiguability but no light headedness. Plaintiff advised Dr. Carroll that she became short of breath if she walked further than two to three blocks or climbed two flights of stairs. An examination of the cervical spine was umremarkable. Plaintiff had a full range of motion of the thoracolumbar spine but pain and spasm were elicited at full extension. Straight leg raising was negative. As respects the cardiovascular system, the borders of cardiac dullness were displaced to the left and there was a grade II/VI systolic ejection murmur at the left sternal border without radiation. An examination of the knees revealed mild hypertrophic changes and a full range of motion but pain and spasm were elicited on full flexion and full extension. Examination of the wrists were normal but one of the hands revealed mild hypertrophic changes involving the PIP and DIP joints compatible with degenerative arthritis but with no functional limitations and no impairment of

grip strength.   An EKG produced abnormal results compatible with left ventricular hypertrophy and possible left atrial enlargement.

In order, Dr. Carroll diagnosed plaintiff suffering from: 1) degenerative joint disease with mild functional limitations involving the knees and thoracolumbar spine; 2) heart disease with a) hypertension, under treatment and control b) cardiomegaly c) sinus arrhythmia, abnormal electrocardiogram d) Class IIB; 3) adult onset, insulin-requiring diabetes mellitus, under follow-up and treatment; 4) elevated serum cholesterol, under treatment; and, 5) post-op status: removal of spur from left heel in 1985.   In his summary, Dr. Carroll opined that plaintiff's functional/therapeutic classification was IIB and that she suffered from mild functional limitations involving the thoracolumbar spine and knees.   (Tr. pp. 194-203).

On April 10, 2003, an Administration medical consultant reviewed plaintiff's file and determined that she could lift fifty pounds occasionally and twenty-five pounds frequently; could sit, stand, and/or walk for six hours per eight-hour workday; and, had no postural, manipulative, visual, communicative, or environmental limitations.   (Tr. pp. 204-211).

Plaintiff was seen at MCLNO for a routine gynecological evaluation on April 26, 2003.   (Tr. pp. 220-223).   Two days later, she was seen by Dr. Judith Hackett for monitoring of her various conditions.   Medications were dispensed.   (Tr. pp. 231-233).   A

15

pelvic ultrasound was conducted on May 19, 2003 to aid in diagnosing plaintiff's complaints of pelvic pain. (Tr. pp. 216-217). On that same day, plaintiff returned to Dr. Hackett for complaints of ear pain. (Tr. p. 230). Dr. Hackett then executed a pre-printed form which was geared to eliciting her opinions on plaintiff's ability to do work-related activities. On the form, the doctor indicated that plaintiff's ability to lift/carry was affected by degenerative joint disease of the lumbosacral spine to some unspecified degree; that plaintiff's ability to stand/walk was affected by her diabetes, hypertension, heel spurs, and degenerative joint disease of the knees and lumbar spine to some unspecified degree; that plaintiff could sit for only two hours per eight-hour workday; that plaintiff could perform no postural maneuvers; that plaintiff's ability to reach, handle, feel, push/pull were affected by her impairments to some unspecified degree; that plaintiff was to avoid dust and moving machinery due to possible shortness of breath, fluctuating blood sugar, and dizziness; and, that overall, plaintiff suffered from insulin-dependent diabetes mellitus, cataracts in the left eye, degenerative joint disease of the knees, hypertension, a heart murmur, disc disease of the lumbosacral spine, and angina treated with nitroglycerine. (Tr. pp. 224-227).

Plaintiff was seen again at MCLNO on July 12, 2003 for follow-up gynecological care. (Tr. pp. 214-215). She returned to Dr.

16

Hackett on August 18, 2003 for treatment of a cold and pain in the chest and underneath the breast.  Her medications were adjusted. (Tr. p. 255).  Plaintiff was next seen by Dr. Hackett for further monitoring on November 17, 2003 and complained of right shoulder pain, a "slipping" feeling in the right ankle, similar pain in the left knee, and tooth pain.  The assessment was "pain" for which Darvocet was prescribed.  (Tr. p. 254).  A mammogram performed on December 16, 2003 was negative.  (Tr. p. 259).  Various medications were prescribed by Dr. Hackett on January 27, 2004 who also apparently agreed to recommend plaintiff for a handicap parking sticker.  (Id.).

The next medical records are dated April 6, 2004 and document plaintiff's evaluation by Dr. Denardo Dunham of Premier Foot Specialists, L.L.C. for complaints of right toe pain.  The assessment was calluses, an in-grown toenail, and diabetes mellitus.  Her toenails and lesions were debrided and a window was cut in her left distal nail to relieve the pressure.  (Tr. p. 250). Plaintiff returned to Dr. Hackett for routine follow-up care on April 19, 2004 and complained of continuing pain in the back and right leg which had prompted her to go to the emergency room two days earlier.  She also complained of a sinus drip.  Plaintiff's blood pressure was 134/53 at the time.  The assessment was sciatica and medication was prescribed.  (Tr. p. 252).  Pursuant to a referral by Dr. Hackett, plaintiff underwent a motor nerve study

that same day.   Plaintiff advised the tester that she was experiencing numbness and tingling in the right hand and fingers and swelling and pain in the left wrist reportedly due to spurs. She also complained of right leg pain from the lower back down to the calf with her knee giving out and similar pain and functional compromise in the left leg.   The impression was right carpal tunnel syndrome and peripheral polyneuropathy.   (Tr. pp. 239-246).

Plaintiff underwent an MRI of the lumbar spine to better diagnose her complaints of pain, particularly in the right lower extremity, and tenderness in the left hip.   The impression was a left far lateral disc bulge at L4-L5 without definite neural foramina narrowing or canal stenosis.   An MRI of the right hip revealed an abnormal bone marrow edema noted within the lateral aspect of the sacrum which possibly represented an area of stress edema.   Coincidentally, findings suggestive of a myomatous uterus were discovered.   (Tr. pp. 237-238).   Plaintiff then returned to Dr. Hackett on May 18, 2004 for left arm and tooth pain.   The assessment was right carpal tunnel syndrome and sciatica. Medications were prescribed.   (Tr. p. 252).

On June 21, 2004, plaintiff was evaluated by Dr. Ben Idowa of the Neurology and Memory Disorder Clinic.   Back pain and carpal tunnel syndrome were plaintiff's chief complaints.   The impression was bilateral carpal tunnel syndrome, lumbosacral polyradiculopathy, and obesity.   The plan was for plaintiff to use

18

a wrist brace, to lose weight, to exercise, and to receive trigger point injections in both wrists which were administered on June 23, 2004. (Tr. pp. 235-236).

Plaintiff failed to keep an appointment at Premier Foot Specialists that was scheduled for July 7, 2004. (Tr. p. 249). She did see Dr. Dunham again on August 17, 2004 for routine diabetes foot care.  Her toenails and lesions were debrided and topical cream was prescribed. (Tr. p. 249). On August 30, 2004, plaintiff returned to Dr. Hackett for refills on her medications, a cough, and pain under her left breast.  The diagnosis was diabetes and chest pain. An EKG was ordered. (Tr. p. 251). Between April 12, 2004 and October 11, 2004, plaintiff was seen on four separate occasions by Dr. Henry Haley, an eye specialist, for complaints of occasional pain in the left eye and blurry vision. (Tr. pp. 262-282). Plaintiff was diagnosed with borderline chronic open angular glaucoma ("COAG") on April 12, 2004. (Tr. p. 265). With treatment, plaintiff's visual acuity had improved by May 6, 2004. (Tr. p. 263). Dr. Haley diagnosed plaintiff with COAG of the right eye and possible COAG of the left eye on October 11, 2004.  Medications were prescribed and plaintiff was counseled on their use. (Tr. p. 262).

As noted earlier, plaintiff challenges the Commissioner's decision to deny Social Security benefits on two grounds.  In the first of those, plaintiff alleges that the ALJ erred in failing to

find her disabled under Rule 201.06 of the Medical Vocational Guidelines (the "Grids").

Unlike the typical Grid case in which the claimant argues that the Medical-Vocational Guidelines were wrongfully applied in a rigid, mechanical fashion to find her not disabled, see, e.g., Wingo v. Bowen, 852 F.2d 827, 831 (5th Cir. 1988), plaintiff herein argues that the Grids should have been applied to find her disabled. The use of the Grids is appropriate, however, only if the fifth step in the §416.920 analysis is reached. Selders v. Sullivan, 914 F.2d 614, 618 (5th Cir. 1990)(citing 20 C.F.R. §404.1569 and Subpt. P, App. 2; Fraga, 810 F.2d at 1304). In adjudicating plaintiff's application for Social Security benefits, the ALJ first found, at the fourth step of the sequential analysis, that plaintiff was capable of performing her past relevant work as a cashier as that work is customarily performed at the sedentary and light levels in the national economy. (Tr. p. 23, finding 9). The ALJ could have concluded his inquiry at that step, Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987), and use of the Grids would not have been justified at all. Torres v. Harris, 502 F.Supp. 518, 524 (E.D. Pa. 1980).

Although the ALJ alternatively proceeded to step five of the sequential analysis, that fact, standing alone, does not mandate that the Grids be utilized. At the fifth step, the ALJ must determine whether there is other work available that a claimant can

perform.   "When  the  claimant  suffers  from  only  exertional impairments or his non-exertional impairments do not significantly affect  his  residual  functional  capacity,  the  ALJ  <u>may</u>  rely exclusively on the Guidelines in determining whether there is other work available that the claimant can perform."  <u>Selders</u>, 914 F.2d at  618  (emphasis  added).  "Otherwise,  the  ALJ  <u>must</u>  rely  upon vocational  testimony  or  other  similar  evidence  to  establish  that such jobs exist."  <u>Fraga</u>, 810 F.2d at 1304 (citing <u>Lawler</u>, 761 F.2d at 198)(emphasis added).  "The value of a vocational expert is that he  is  familiar  with  the  specific  requirements  of  a  particular occupation,  including  working  conditions  and  the  attributes  and skills needed."  <u>Fields v. Bowen</u>, 805 F.2d 1168, 1170 (5th Cir. 1985).   "A vocational expert is able to compare all the unique requirements  of  a  specified  job  with  the  particular  ailments  a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job."  <u>Id</u>. Recognizing that the Dictionary of Occupational Titles ("DOT") is not comprehensive, because it cannot and does not purport to include each and every specific skill and qualification for a particular job, the Fifth Circuit in <u>Fields</u> even went so far as to conclude that the DOT is not "similar evidence" that would satisfy the Commissioner's burden of proof at the fifth step of §416.920.  <u>Fields</u>, 805 F.2d at 1170-71.  "DOT job descriptions should not be given a role that is exclusive of more specific vocational expert testimony with respect

to the effect of an individual claimant's limitations on his or her ability to perform a particular job." <u>Carey v. Apfel</u>, 230 F.3d 131, 145 (5th Cir. 2000).

Here, the ALJ properly relied on expert vocational testimony rather than mechanically applying of the Grids in assessing plaintiff's ability to perform other work.  That approach is counseled by the case law and the Regulations themselves. <u>Fields</u>, 805 F.2d at 1170-71; <u>Lawler</u>, 761 F.2d at 197-98; <u>Dellolio v. Heckler</u>, 705 F.2d 123, 126-28 (5th Cir. 1983).  Moreover, because plaintiff had transferrable work skills from her previous semi-skilled and skilled jobs of cashier and insurance agent, respectively, Rule 201.06 was inapplicable in any event.  20 C.F.R. §404, Subpt. P, App. 2, §201.00(d).  This claim is without merit.

In her second challenge to the Commissioner's decision, plaintiff alleges that the ALJ erred by failing to find her disabled due to the combination of her multiple impairments.

In the Disability Report submitted in connection with plaintiff's request for Social Security benefits, she identified high blood pressure, diabetes, back and heart conditions, spurs on the body, and a heart murmur as the conditions resulting in her inability to work.  In his written decision of December 20, 2004, the ALJ carefully summarized the evidence regarding plaintiff's treatment for hypertension, diabetes mellitus, lumbosacral and knee pain, right carpal tunnel syndrome, chest pain, opthalmologic

difficulties, and hip problems at pages two through four of his opinion.  (Tr. pp. 14-16).  The ALJ then launched into the five-step sequential analysis, first finding that plaintiff's impairments (degenerative joint disease in the hands, knees and right hip; degenerative disc disease of the lumbar spine; diabetes mellitus; history of hypertension; Class IIB heart disease; and, carpal tunnel syndrome) were severe but then determining that "... claimant's impairments, whether considered singly or in combination ...", failed to satisfy the criteria of any condition set forth in the Listing of Impairments.  (Tr. p. 17)(emphasis added).  Next, the ALJ discussed the functional limitations resulting from plaintiff's various impairments in ultimately determining her her residual functional capacity to work, specifically noting that his assessment reflected ".... full consideration of the impact of claimant's diabetes, hypertension, degenerative orthopedic concerns and cardiac condition, including allegations of weakness, joint pain, back pain and shortness of breath.  (Tr. pp. 17-22).  And in the "Findings" portion of his opinion, the ALJ again found that "... claimant's impairments, whether considered singly or in combination, ..." failed to establish her disability as that term is defined by the Social Security Act.  (Tr. p. 23)(emphasis added).

Contrary to plaintiff's assertions, the record reflects that the ALJ did consider the combined effect of her impairments in

adjudicating her application for Social Security benefits.   The medical evidence indicates that plaintiff's degenerative changes in her musculoskeletal system required only conservative care, that her diabetes and hypertension were controlled, and that any functional loss due to carpal tunnel syndrome was minimal. As noted by the ALJ, the latter complaints and the treatment therefor did not occur until subsequent to the alleged disability onset date. Dr. Carroll found no evidence of end organ damage due to plaintiff's diabetes and he opined that plaintiff had only mild functional limitations involving the back and knees.   After reviewing the medical records then extant, an Administrative medical consultant reached a similar conclusion.   And although plaintiff had only seen Dr. Hackett on two occasions, once for general follow-up care and then for ear pain, neither visit of which did the doctor impose any functional restrictions on plaintiff, the pre-printed form that the doctor completed on May 19, 2003 paints a much bleaker picture of plaintiff's capabilities. Moreover, Dr. Hackett failed to specifically identify the extent to which plaintiff's impairments effected her ability to lift/carry, stand/walk, reach, handle, or feel, or push/pull.   The ALJ thus accorded Dr. Hackett's findings the diminished weight that they deserved.   Newton v. Apfel, 209 F.3d 448, 455-56 (5th Cir. 2000); Brown v. Apfel, 192 F.3d 492, 500 (5th Cir. 1999); Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994), cert. denied, 514 U.S.

1120, 115 S.Ct. 1984 (1995).

In plaintiff's Disability Report, although she indicated that her conditions first manifested themselves on October 1, 1999 and caused her to be unable to work on that same date, she later stated that she had been terminated from her most recent job as an insurance agent. (Tr. p. 92). In her Disability Supplemental Interview Outline that she completed on February 12, 2003, plaintiff indicated that she could take care of her own personal needs, do household maintenance, shop, and drive a car. (Tr. pp. 105-112). Reports such as these may properly be considered by the ALJ in determining a claimant's disability status. Vaughn v. Shalala, 58 F.3d 129, 131 (5th Cir. 1995); Villa, 895 F.2d at 1022-23. Plaintiff provided similar testimony at the administrative hearing. (Tr. p. 300). The performance of such activities is not indicative of someone who can perform no work activities whatsoever. The mere fact that plaintiff has been diagnosed as suffering from various conditions and that she takes numerous medications to control them does not, in and of itself, compel the conclusion that she is disabled within the meaning of the Social Security Act.

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this 20th day of _____June_____, 2006.

_____
UNITED STATES MAGISTRATE JUDGE